## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |  |
|---|---|---|
| DENA SWACKHAMMER, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 03-2548-CM** |
| | ) | |
| SPRINT/UNITED MANAGEMENT CO., | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM AND ORDER

On October 29, 2003, plaintiff Dena Swackhammer brought this cause of action against defendant Sprint/United Management Company.  Plaintiff claims that defendant terminated her employment in October 2002 because of her gender, in violation of the Kansas Act Against Discrimination (KAAD), Kan. Stat. Ann. § 44-1001 *et seq*., and Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e, *et seq*.  This matter comes before the court on defendant's Motion for Leave to File Supplemental Exhibit (Doc. 134) and defendant's Motion for Summary Judgment (Doc. 120).

I.      **Motion for Leave to File Supplemental Exhibit**

Defendant has moved for leave to file as a supplemental exhibit pages 1-25 of Antonio Castanon's deposition, which was listed on the exhibit index with defendant's memorandum in support of its Motion for Summary Judgment as E1, but which was omitted from the electronic filing system with the court.  For good cause shown, the court grants defendant's Motion for Leave, and considers the supplemental exhibit filed as of February 3, 2005.  The court finds that plaintiff is not prejudiced by the filing of the supplemental exhibit. Plaintiff had a transcript of Castanon's deposition and has attached portions of Castanon's deposition in

opposition to defendant's Motion for Summary Judgment.  Moreover, plaintiff's objections to certain of

defendant's statements of facts as being unsupported by the record where defendant cites to pages 1-25 of

Castanon's deposition are moot in light of the court's ruling on this issue.

## II.      Facts[1]

### A.        Plaintiff's Employment with Defendant

Plaintiff is a female.  On December 8, 1997 defendant hired plaintiff as Vice President of Loyalty.

Her assignment was to reduce PCS (cell phone) turnover.  Her supervisor was Chuck Levine, then the

Chief Sales and Marketing Officer.  In 1999, plaintiff became responsible for supervising the newly created

Data Base Marketing function, and her title changed to Vice President of Customer Management.  In

October 2000, when Levine was promoted to President, Scott Relf, Senior Vice President of Marketing,

became plaintiff's supervisor.  Her duties and job title remained unchanged.  In May 2001, plaintiff began

reporting to Antonio Castanon, Senior Vice President of Customer Solutions, a hispanic male.  Castanon

reported directly to Levine, until Levine left defendant on September 30, 2002.  In Spring 2002, the

individuals who directly reported to Castanon included plaintiff and four other vice presidents, including two

other women and two men (Faerie Kizzire, Laurie Kistler, Todd Waletzski, and Alan Winters).

Plaintiff's duties remained unchanged, but her title was changed to Vice President of Customer

Solutions.  In August 2001, plaintiff became responsible for supervising PCS "call centers" and other

customer care functions.  She continued to report to Castanon, but her title was changed to Vice President

of Strategy and Activations.

_____

[1]The court construes the facts in the light most favorable to plaintiff as the nonmoving party pursuant
to Fed. R. Civ. P. 56.

During the first week of October 2002, plaintiff was assigned to defendant's Interim Task Force for Removing Cost from the Business.  Plaintiff claims that, although she remained a vice president, her former job responsibilities were reassigned to three men: Chip Novick, Vice President of Consumer Marketing, Phil Bowman, Vice President of Business Marketing, and Pragnesh Shah, Assistant Vice President of Customer Solutions.  Castanon told plaintiff that she would remain on the task force until Jim Kissinger, then the Vice President of Human Resources,[2] located a permanent position for her.  Plaintiff remained a vice president in the interim assignment until defendant terminated her employment in October 2002.  Castanon was plaintiff's direct supervisor at the time her employment was terminated.  Defendant contends that when plaintiff's employment was terminated, Shah assumed her existing responsibilities, and the rest of her responsibilities were assumed by the marketing department.

**B.     Paul Garcia's Employment with Defendant**

Paul Garcia worked for defendant from August 11, 1986 to January 1992 and again from October 13, 2000 to October 14, 2002.  Plaintiff hired Garcia in October 2000 as the Senior Director of Database Marketing and Customer Relationship Management.  Garcia remained a Senior Director until defendant terminated his employment in October 2002.  During his employment from October 2000 to October 2002, except for his last month of employment, Garcia reported directly to plaintiff.  During the last month Garcia worked for defendant, Garcia reported to Shah.

**C.     Plaintiff's Selection to the Executive Talent Pool**

---

[2]Kissinger is currently the Senior Vice President of Human Resources.

While plaintiff worked at defendant, she understood that she was "being groomed for greater things."  Defendant provided plaintiff with two executive performance coaches, one internal in 2001 and one external in 2002.  Defendant uses performance coaches to maximize the talent of select executives in the corporation.  The performance coaches observe the executives to whom they are assigned and determine how the individuals can improve presentation and interaction skills, and help to identify and address any development needs of the individual.

Plaintiff was assigned a performance coach because she was part of a talent pool organization which identified individuals who defendant thought had the potential to move to the next level and take more responsible positions in the future.  Plaintiff thought it was a great thing to be selected as part of the executive talent pool and believes that the decision had to be supported by the entire executive management team, which included Castanon.

Kissinger was also one of the people who took part in the decision to place plaintiff in the executive talent pool.  Kissinger confirmed the recommendation and provided input.  According to Kissinger, the decision to place plaintiff in the executive talent pool would have been facilitated by Castanon, her direct supervisor.  Kissinger believes that Castanon nominated plaintiff for the selection.

**D.**    **Plaintiff's Performance Reviews**

In April 2002, Castanon gave plaintiff her annual performance review for the year 2001.  Plaintiff did not disagree with any part of Castanon's review and thought that it was a good review.  In July 2002, and again on October 1, 2002, Castanon gave plaintiff interim performance reviews for 2002.  With regard to both interim performance reviews, the only issue that Castanon and plaintiff disagreed about was

customer turnover.  In his deposition, Castanon described plaintiff as an "outstanding employee," a "great performer," "highly regarded" and an "absolute star in the organization."

     **E.**    **Plaintiff's Knowledge Of Defendant's Principles Of Business Conduct**

During her employment, plaintiff knew that defendant had rules governing employees' dealings with vendors.  The rules were contained in defendant's Principles of Business Conduct (PBC).  Plaintiff testified that defendant's policies changed from time to time and could be updated at any time with some sort of notice to employees.  Plaintiff recalls that the PBC was modified at least one time during her employment.  Plaintiff does not recall having a paper copy of the PBC but testified that it was available on-line.

Plaintiff testified that there were "all sorts of opportunities" for employees to take advantage of vendor situations.  Plaintiff testified that some of the ways that employees might try to take advantage of situations or relationships with vendors include: (1) quid pro quo relationships, (2) receiving gifts in return for favors to vendors, or (3) maybe hiring certain vendors because the employee received something.  However, plaintiff testified that she could not say specifically why defendant has a set of rules governing employee conduct in relationships with vendors.

Plaintiff testified that, in December 2001, Levine told her that, under the vendor travel policy, if an employee was in current negotiations with a vendor, or the vendor was trying to work through pricing or get an employee to buy its product, it was inappropriate for the vendor to pay for travel. However, if the employee had no current business with the vendor and was not in negotiations with the vendor, and the employee and the vendor had an existing relationship that could not likely be impacted by travel, then the vendor could pay for travel.

Plaintiff testified that she does not believe that she violated defendant's PBC as she understood it. However, plaintiff also testified that, once she read the policy, she realized that there was a difference between the principles set out in the policy and her actions. Plaintiff also claims that because the PBC changed at least once during her employment, plaintiff cannot be sure to which version of the policy defendant refers in its summary judgment motion.

### F.     Complaints

On July 18, 2002, plaintiff received, and Castanon was copied on, an anonymous complaint about Garcia. Plaintiff discussed the complaint with Garcia. Garcia testified that, in response to the complaint, plaintiff questioned him about whether he had meetings or vendor trips scheduled around social events and whether he bragged about trips he had taken. Castanon did not direct plaintiff to counsel Garcia or to change any behavior as a result of the complaint.

On August 2, 2002, defendant received an anonymous complaint on its ethics hotline alleging that Garcia had placed confidential information on a public server and had also received inappropriate gifts from vendors. In response to the August 2, 2002 complaint, plaintiff talked with Garcia and with Castanon. Plaintiff told Garcia that he should be careful about backing up confidential information on a shared computer drive.

On August 8, 2002, defendant's ethics office, Levine and Castanon received an anonymous, written complaint about alleged unethical conduct in the Customer Solutions Group, and particularly by Garcia. Kissinger received a copy of the August 8, 2002 complaint on August 9, 2002. Plaintiff was not informed of the August 8, 2002 complaint and did not see a copy of the complaint until this litigation began. On

August 13, 2002, Corporate Security opened its case file and began its investigation of the August 8, 2002 complaint.  Corporate Security interviewed both Garcia and plaintiff on September 30, 2002.

On August 16, 2002, John Meyer received an anonymous written complaint about Castanon and Alan Winters, a male vice president who reported to Castanon, regarding alleged unethical behavior with outside vendors.  Faerie Kizzire, a female vice president who also reported to Castanon, made the August 16, 2002 complaint.  Corporate Security interviewed Kizzire about the August 16, 2002 complaint on August 23, 2002; Winters on October 2, 2002; and Castanon on October 4, 2002.  In her statement to Corporate Security regarding the complaint, Kizzire discussed the close relationship between Castanon and Winters.

### G.    Plaintiff's Interview with Corporate Security

Plaintiff first learned there was a Corporate Security investigation involving complaints about Garcia on September 30, 2002.  That day, Castanon called her and told her that he had been contacted by Corporate Security.  Castanon asked plaintiff to call Corporate Security.  Plaintiff asked Castanon if he knew what it was about and he said, "No."  She replied, "Well, I can only assume this is related to that data issue that we got on the ethics hotline.  I guess I need to go and let them know that that's been resolved."  Castanon responded, "I don't know."  Plaintiff then called Corporate Security to see if she could delay the meeting so that she could attend a staff meeting that Castanon was holding, and Corporate Security told her that she could not.

Plaintiff met with Corporate Security the same day.  Loren Procter and Paul Bass conducted the interview, which lasted between two to three hours.  During the interview, Procter and Bass showed plaintiff defendant's travel and gift policy and asked if she remembered reading the policy.  Plaintiff testified that she

was aware of the policy's existence and was "generally aware" of defendant's policies. Plaintiff testified that she believed that the corporate policies that Corporate Security showed her were the same policies that were available on-line.

On October 2, 2002, Corporate Security prepared a draft statement summarizing the discussion plaintiff had with them, and provided it to plaintiff. Plaintiff reviewed the draft statement and made modifications to it. She waited while Corporate Security made the changes. She does not recall how many drafts they went through together before they got to the final version. Plaintiff's draft statement includes her handwritten modifications. She reviewed and signed the final version of her statement the same day. She admits that, by signing, she was acknowledging that the statements and facts recited in the statement were true and correct. The statement and facts were true and correct, however, plaintiff testified they were not complete because there was not a complete description of the discussion she had with Corporate Security over a period of several hours.

Plaintiff testified that she did not add information to the statement she signed because she did not realize or understand at the time that she was being investigated and that her job was potentially going to be terminated as a result. Plaintiff felt like the conversation she had with the investigators, who were shaking their heads and acknowledging what she was saying, was sufficient and that they had captured the components of her testimony that were relevant to the discussion.

Plaintiff asked Corporate Security about how her statement would be used. In response, Corporate Security told her that they could not tell her anything about the process, that she just needed to answer the questions, and that someone would notify her when the investigation was complete. Plaintiff testified that, if

Corporate Security would have explained to her the process of how this information would be used and that

she would not have a chance to have any sort of

discussion, she would have tried to get every bit of information into the statement.  It was plaintiff's

understanding that Corporate Security did not feel it was necessary to talk to anyone else besides her and

Garcia.

Plaintiff testified that there appears to be nothing in the signed statement to support her position;

rather, it is just a series of answers to questions which may or may not represent her in a positive light.

Plaintiff believes that Bass and Procter drafted her statement so that it emphasized negative information,

without including information and/or documents that would explain why her actions and the circumstances

did not violate defendant's PBC, including providing a bigger picture of vendor trips that plaintiff took.

Plaintiff also testified that she had no idea why Bass or Procter would want to represent her in something

other than a positive light but that she believed Bass and Procter did not put everything in the statement

because the purpose of the investigation was not to get her full, complete story of how she operated the

business or conducted herself as an employee; instead, the purpose was to gather a set of circumstantial

evidence to be used as an excuse to terminate her employment.  Plaintiff testified that Bass and Procter had

an "ulterior motive" for their investigation other than trying to understand how she conducted herself.

However, plaintiff also admitted that she does not know what Bass's and Procter's ulterior motive may have

been.  Plaintiff admits she does not know that Bass and Procter were trying to get rid of her.

Plaintiff testified that, during her interview, Bass and Procter were asking for names of other

employees, as if they were going to start "some sort of witch hunt" as to those employees as well to see if

there was some sort of inappropriate behavior.  In fact, based upon the questions they asked plaintiff, and

the fact that they asked her to provide names of other people, it appeared to plaintiff that Bass and Procter may have done this same thing with other people.

Having seen Bass and Procter in a couple of depositions, and having heard Garcia's testimony about his interview with Corporate Security, plaintiff now believes that this was a common practice – Bass and Procter are given a task and they "go after" employees with a vengeance.  Plaintiff does not know whether Corporate Security used the same questioning techniques or treated Winters and Castanon any differently when they were questioned.

**H.     Castanon's and Kissinger's Meeting with Corporate Security**

At the conclusion of the investigation into the August 8, 2002 complaint, Procter and Bass from Corporate Security met with Castanon and Kissinger to discuss the relevant facts that were discovered during the investigation.  The meeting took place on October 7, 2002.  Beth Forwalder, an in-house lawyer for defendant, was also present.  Castanon testified that he does not recall Forwalder saying anything during the meeting.

Castanon explained that Procter and Bass were there to answer questions about the facts of the investigation, but Procter and Bass did not participate in the actual termination decision.  Three employees (plaintiff, Garcia and Winters) were discussed during the meeting.  Kissinger testified that plaintiff, Garcia and Winters were all investigated within the same time frame, however, the primary purpose of the October 7, 2002 meeting was to resolve the concerns about plaintiff and Garcia.  Kissinger testified that, during the meeting, Castanon was updated on information from the investigation and asked for a decision on how to proceed with plaintiff and Garcia.  Castanon testified that nobody suggested during the meeting that he or Kissinger talk with plaintiff or Garcia, or obtain additional information before a decision was made.

Castanon also testified that he was not given any information other than what was reflected in the documents he reviewed during the meeting.

Castanon testified that he based his decision to fire plaintiff and Garcia on the documents he received and reviewed at the October 7, 2002 meeting, and that he made the decision to terminate plaintiff's and Garcia's employment during the meeting. During the meeting, Castanon reviewed: (1) plaintiff's statement, (2) Garcia's statement, (3) Winters' statement, (4) the Gifts, Favors, Travel and Entertainment section of defendant's Principles of Business Conduct, (5) the Conflicts of Interest section of defendant's Principles of Business Conduct, (6) a letter to defendant's officers regarding the Travel and Entertainment policy, (7) an April 4, 2002 e-mail from Garcia to plaintiff, (8) a May 29, 2002 e-mail from Garcia to Spero, (9) a June 25, 2002 e-mail from Garcia to plaintiff, (10) a July 23, 2002 e-mail from Garcia to plaintiff, and (11) photographs of plaintiff and Garcia on the Concorde. Castanon testified that, after reviewing the documentation, he believed the "appearance of impropriety" with plaintiff and Garcia was clear.

### 1.      April 4, 2002 E-mail

Plaintiff and Garcia exchanged a series of e-mails on April 4, 2002. Garcia started the exchange with an e-mail bearing the subject line "Devil's Brew." Garcia copied Alex Mannela, an outside consultant employed by a different third-party vendor (Diamond Cluster), on the e-mail. In the e-mail, Garcia wrote: "I just received a bottle of Grand Marnier 150. If my door is closed today, be scared!!!" Plaintiff hit the "reply to all" button and immediately responded: "Who would do that to us?????" In response, Garcia explained: "Enkata, project kick- off!!!" Plaintiff took that to mean that Garcia had received the bottle of

Grand Marnier from someone at Enkata, a third-party vendor, as part of the project kick-off.  The Enkata

project kick-off was to evaluate whether or not defendant wanted to use Enkata's technology.

In response to Garcia's e-mails about the Grand Marnier and the Enkata project kick-off, plaintiff

hit the "reply to all" button and e-mailed back, "What did you score for me???"  Garcia replied: "Michael

wants to get us to SF and possibly a game at Pebble (he's never been and wants to go desperately.)  Don't

worry, the pimp is working."

Plaintiff explained that she was only kidding when she made the "What did you score for me?"

comment.  Since she had been involved with all of the Enkata project meetings, it was just a joke to say,

"You got something, I didn't get anything from them, and I was in all the meetings."

Plaintiff believes that Mannela was copied on these e-mails because Garcia and Mannela were very good

friends and Mannela was aware that Garcia was very fond of Grand Marnier.  Plaintiff also explained that

Mannela was included on the original e-mail and, since she and Garcia hit the "reply to all" button on each of

the subsequent e-mails, Mannela received those as well.

Plaintiff also explained that the "Michael" referred to in the e-mail was "Michael Chen," the head

person at Enkata with whom plaintiff and Garcia had been working.  Plaintiff believed that Michael wanted

them to come out to San Francisco and meet the other people in the company since they were evaluating

Enkata's technology.  With regard to the reference to the game at Pebble, while plaintiff thinks getting a

game may have been a dream for Michael, she knows he could not have pulled any strings to make that

happen.  However, neither plaintiff nor Garcia took a trip to San Francisco to meet with Michael Chen.

Plaintiff also testified that Garcia was kidding when he wrote: "Don't worry, the pimp is working." Plaintiff thinks that Garcia was just joking back with her after she said, "What did you score for me?" She does not think that he was trying to get her something.

Plaintiff had heard at least one of her direct reports jokingly refer to Garcia as "the pimp." Plaintiff never discussed with Garcia the fact that some people called him "the pimp," but said she knew he was aware of it because she overheard some people say it directly to him. Plaintiff never had any concerns about Garcia or others referring to him as "the pimp" because it was a rare occurrence. Plaintiff also testified that e-mail joking with Garcia was rare, and she did not see a pattern of behavior that she needed to address with him.

Castanon testified that he did not believe that the e-mail exchange was a laughing matter. By sending the e-mail "What did you score for me?," Castanon believes that plaintiff was not only soliciting a gift for herself, but was also approving Garcia's behavior. Castanon also testified that he took Garcia's "pimp" reference to mean that Garcia was going to get a vendor to pay for a golf game at Pebble Beach. In Castanon's opinion, that would be a violation of defendant's gift, travel and entertainment policies contained in the code of business conduct. Plaintiff contends that there is no evidence that plaintiff or Garcia got a vendor to pay for a golf game at Pebble Beach. Plaintiff also contends that she did not know the value of the bottle of Grand Marnier. During the investigation, Garcia offered to give the bottle of Grand Marnier to Corporate Security, which Corporate Security refused.

### 2.    May 29, 2002 E-mail

On May 29, 2002, Garcia sent an e-mail to Greg Spero. Spero was a childhood friend of Garcia's who did not work at defendant. The e-mail message reads: "Yeah, another tough week. Golf Friday and

-13-

then off to Australia for a week of work.  FYI, I did get invited to play golf in Aspen with Bill Clinton.  Its [sic] a weekend of business cocktail parties, golf, and a speech by Bill.  I may be able to bring a 'date.'  Everything would be covered except air.  Interested?  We'd have to fly out Thursday July 18th and return that Sunday.  America West and United fly to Aspen."  The e-mail related to an invitation Garcia had received from Info USA, a vendor used by defendant and with which Garcia worked, to attend a privacy conference.  Plaintiff admits she was aware that Garcia was going to Aspen for the conference.  She testified the trip was at Info USA's expense and that she approved the trip for Garcia.  Plaintiff had no knowledge of the e-mail to Spero until after she filed this lawsuit.

Garcia testified that he was joking when he asked Spero if he wanted to go with him to Aspen.  Garcia admits that it would not have been appropriate for Spero to go with him to Aspen because the conference had nothing to do with Spero.  According to Garcia, "It just wouldn't be appropriate to take a friend on a business trip."

Castanon testified that he believed the e-mail violated defendant's business principles because it clearly stated that the vendor would pay every expense on the trip except for airfare.  However, defendant's policy states that employees should not attend any such event if it does not serve a business purpose for defendant.  Castanon admits that he did not know whether Garcia went on the trip.

### 3.    June 25, 2002 E-mail

In a June 25, 2002 e-mail from Garcia to plaintiff, Garcia forwarded plaintiff an e-mail from Holly Valenta, a director of finance, and asked: "Think she'd be my date in Aspen?"  Garcia testified that this was a joke and that he was not serious about asking Valenta to go to Aspen as his date.  Other than the reference to the trip to Aspen in the e-mail, Castanon testified that there was nothing in the e-mail that

violates any of defendant's ethical policies.  Plaintiff contends that the mention of a vendor trip does not

violate defendant's business principles.  Plaintiff previously had told Garcia that it was inappropriate to joke

about Valenta.

### 4.    July 23, 2002 E-Mail

On July 23, 2002, plaintiff forwarded a series of e-mails about Diamond Cluster's rates to Garcia.

Plaintiff's group had an ongoing relationship with Diamond Cluster.  Plaintiff's group had just completed the

end of a contract with Diamond Cluster and had renegotiated rates for the next term of Diamond Cluster's

work.  Garcia had worked directly with a representative from Diamond Cluster to negotiate the rates.

The e-mails explain that another department at defendant was considering competing bids from both

Diamond Cluster and another vendor, Booz Allen Hamilton.  In its bid, Diamond Cluster had stated its

standard rate.  However, the other department at defendant believed that plaintiff's group had negotiated a

fifty percent discount off of Diamond Cluster's standard rate.  In the e-mail to plaintiff, she was asked to

confirm Diamond Cluster's current rate for the work it was performing.  Rather than confirm the Diamond

Cluster rate, plaintiff forwarded the e-mail to Garcia and asked him to comment on the Cluster rates.

In response, Garcia sent the following e-mail: "Dena, I'm actually going to discuss this with Jonathan

first on how to position it so he doesn't get screwed on other work if that's OK.  But I DO WANT to show

we are good negotiators and do pay LESS!!!"  The "Jonathan" referred to by Garcia was Jonathan

Harrison, the Diamond Cluster consultant who was heading the projects and negotiating on behalf of

Diamond Cluster.  Plaintiff interpreted Garcia's e-mail to mean that her group needed to make sure that the

rate information it provided to the other department was clearly discussed because of the way in which her

group had negotiated those rates and so that her group would not have to renegotiate its own rates with

Diamond Cluster.

Plaintiff explained that both defendant and Diamond Cluster would be hurt if Diamond Cluster's

hourly rate was watered down.  According to plaintiff: "If Sprint came back and said, "Okay, we're only

willing to pay half your rate," Diamond Cluster would say, "I can't do it for that." According to Plaintiff,

"[T]hat's not a fair representation of the work Diamond Cluster had been providing and the request Sprint

was making of it."  Plaintiff never approached Garcia about the e-mail.  She testified that she had a complete

understanding of what Garcia was going to discuss and agreed with it.

Until she heard Garcia testify in his deposition in this case, plaintiff did not know whether Garcia had

discussed the situation with Harrison at the time.  Plaintiff testified that she didn't think there was any

confidential information in the e-mails that Garcia could have shared with Harrison, but admitted that it

would have been inappropriate for Garcia to share confidential bid information with a vendor.

Castanon testified that Garcia's e-mail led him to believe that Garcia was meeting with Diamond

Cluster to disclose to Diamond Cluster the rates of a competitor so that the competitor would not undercut

Diamond Cluster's rates.  Castanon testified that Garcia's e-mail made it appear to him that Garcia was

going to discuss the bid with Diamond Cluster.  Castanon explained that it was inappropriate for Garcia to

insinuate that he was going to have a discussion like this with Diamond Cluster.  Castanon testified that

plaintiff should have addressed the fact that this was a confidential conversation and that defendant does not

share bids with competitors.

Plaintiff contends that Corporate Security's investigation never established that Garcia shared

proprietary information with Diamond Cluster or that Garcia ever discussed with Diamond Cluster the

pricing of a competitor's bid.  Castanon admitted that he did not know whether Garcia discussed the issue

with anyone at Diamond Cluster.  Plaintiff also contends that neither Castanon nor Corporate Security asked

her if she followed up with Garcia about his e-mail before Castanon decided to terminate her employment.

### I.      Castanon's Termination Decisions

Castanon testified that he believed Corporate Security had conducted a thorough review of the facts

and presented the facts.  He testified that he believed there was enough information presented to show that

plaintiff had failed to adhere to defendant's policies, had shown disregard for managing  Garcia, and had

participated in and allowed a series of exchanges that were completely improper.

Castanon testified that he fired plaintiff because she had violated a "series" of defendant's business

and ethical policies relating to third-parties and vendors.  The two primary reasons he fired plaintiff were: (1)

she violated defendant's business and ethical policies associated with vendors; and (2) she failed to properly

supervise Garcia with respect to those policies.  Castanon testified that it was clear from the documentation

presented at the meeting that Garcia had violated defendant's policy on ethical business practices on a

number of occasions and that plaintiff was, in many cases, copied on those same documents and chose not

to take any action or address it.  In some cases she even chose to participate in the behavior or at least gave

the appearance that she was participating in it.  Castanon testified that he considered plaintiff's own

violations, as well has her failure to properly supervise Garcia, to be "equally serious."  Castanon admits that

he has no proof that defendant was harmed financially by plaintiff's alleged misconduct, and that he does not

know whether or not plaintiff was ever successful in getting Garcia to obtain benefits from vendors for her.

According to Castanon, it was the "appearance of impropriety" that mattered to him.

-17-

Castanon described his decision to fire plaintiff as "very difficult" because plaintiff was an outstanding employee and it was difficult to comprehend her participation in the conduct, as well as her lack of management with regard to Garcia's behavior. However, based upon the information he reviewed during the October 7, 2002 meeting, Castanon believed that plaintiff's apparent violations of the corporate business ethics were serious enough to justify termination and that plaintiff showed a lack of judgment that compromised defendant's reputation. Castanon does not know whether plaintiff or Garcia personally benefitted from any of their behavior but believed it violated defendant's business practices.

Plaintiff contends that there is no evidence in the facts and documents that Castanon reviewed to prove that either plaintiff or Garcia engaged in misconduct or violated defendant's policies.

After the October 8, 2002 meeting with Corporate Security and Forwalder, Kissinger prepared a document entitled "Talking Points" that reflect the conversations that Castanon and he had as they discussed plaintiff's situation during the meeting. According to Kissinger, the Talking Points were prepared after the meeting and not only include the decision that was made, but also reflect the concerns that led to the decision.

Kissinger testified that the reasons defendant fired plaintiff are summarized in the Talking Points and that the reasons included: (1) Not properly reporting or receiving advance approval for vendor paid entertainment for plaintiff or Garcia; (2) Participating or allowing an unreasonable level of vendor-paid entertainment (or defendant-paid); (3) Soliciting or encouraging vendor entertainment; (4) Creating potential or apparent conflicts of interest and inappropriate relationships with third-parties. The Talking Points state that, based on the available facts, there appeared to be clear violations of the spirit and intent of defendant's PBC.

-18-

J.      **Kissinger's Role in the Termination Decisions**

Kissinger testified that, from the e-mails between plaintiff and Garcia, plaintiff was aware that Garcia was receiving alcohol and soliciting golf trips from vendors, and her lack of response to the behavior led Kissinger and others to believe that she was encouraging Garcia's behavior.

According to Kissinger, plaintiff created real or potential conflicts of interest by receiving things of value from vendors that her group does business with or were negotiating with, which creates the perception within plaintiff's organization and perhaps even among vendors that vendor-paid gifts are accepted and expected. Kissinger testified that defendant's policy prohibits conduct that creates an actual or apparent conflict of interest. In Kissinger's opinion, a conflict of interest exists if an employee is receiving gifts from someone with whom that employee is supposed to have an objective vendor relationship.

Kissinger also thought that the e-mail exchange referencing the bidding by Diamond Cluster on other defendant business created an actual or apparent conflict of interest. Regardless of whether it was an actual or apparent conflict, Kissinger thought the conduct was inappropriate. Kissinger testified that plaintiff had an obligation to represent the interests of defendant and that it was inappropriate for her subordinate to advise a vendor with whom they do business about how to position itself so it does not get "screwed." Kissinger testified: "That's not our responsibility. It's not a responsibility of management and it's inappropriate." In sum, Kissinger explained that they looked at the totality of circumstances reflected in the Talking Points and concluded that it reflected a pattern, practice and created an environment that they thought was inappropriate, not in line with defendant's principles, and that needed to be addressed.

Plaintiff contends that there is no evidence that Garcia actually solicited golf trips from vendors. Plaintiff also contends that Garcia and plaintiff denied engaging in any misconduct, and there is no evidence

-19-

that either plaintiff or Garcia engaged in any misconduct or unreasonably solicited or encouraged vendor-paid entertainment.  Plaintiff also contends that there is no evidence within the e-mails and photographs provided to Castanon and Kissinger that plaintiff and Garcia in fact engaged in misconduct.  Plaintiff argues that, in conducting its investigation, Corporate Security never established that Garcia shared proprietary information with Diamond Cluster, and therefore, within the information Kissinger reviewed there was no evidence that plaintiff or Garcia created an actual or apparent conflict of interest.  In fact, Garcia told Corporate Security that he did not ever talk to Harrison about the rates because the project got cancelled before Garcia made any response.

### K.  Plaintiff's Termination

On October 14, 2002, plaintiff met with Castanon and Kissinger in a conference room. Castanon informed plaintiff that her employment was being terminated as a result of the Corporate Security investigation and that plaintiff should leave directly from there, without going back to her office.  According to Kissinger, Castanon essentially walked through all the Talking Points with plaintiff.  Kissinger was confident that Castanon covered all of the Talking Points because there was one point that was left out that Kissinger raised to make sure it was covered.  Plaintiff contends that all she remembers of the termination meeting was that Castanon told her that her employment was being terminated because of the investigation. Plaintiff does not recall Castanon going through all of the Talking Points.

During the meeting, Kissinger told plaintiff that her termination was in no way based on performance and that she had been an excellent performer.  Plaintiff asked them how they could believe that there were any ethics or issues concerning her integrity.  She offered her service record and told them how she had basically put the company in front of her own personal life on many occasions.  She also questioned how

they were going to sleep at night having questioned her integrity and insinuating there had been any improper behavior knowing what they knew about her.  Neither Castanon nor Kissinger had any response to plaintiff's comments.  She does not believe that either of them said anything else during the meeting.

### L.    Garcia's Termination

Garcia's employment was terminated on the same day as plaintiff's.  Castanon was not Garcia's direct supervisor, and Garcia had very little contact with Castanon.  However, Garcia was in Castanon's organization.  Castanon concluded that he would make the termination decisions for both Garcia and plaintiff because their investigations were related.  Although Shah was Garcia's direct supervisor at the time Garcia's employment was terminated, Shah was not involved in the termination decision.  However, even though Castanon made the decision to terminate Garcia's employment, Castanon was not part of the meeting to inform Garcia of the decision.  On October 14, 2002, Shah and Kissinger met with Garcia, and Shah told Garcia that he had been terminated.

Castanon testified that he fired Garcia for the same "series of events" reflected in the documents that caused him to fire plaintiff.  According to Castanon, Garcia's failure to get advance written approval for certain vendor paid travel, as well as the other facts discussed, showed a pattern of lack of judgment that warranted termination.  Castanon testified:  "[T]his is not a junior guy in the organization.  This is a senior guy in the organization who absolutely should have known better."

Castanon never said anything to plaintiff about Garcia that she interpreted as derogatory towards Garcia's race.  On one occasion during a staff meeting, Garcia heard Castanon joke about how Hispanics speak.  However, he does not remember what Castanon said or when he said it.  Other than his termination of employment, Garcia did not have any complaints about how Castanon treated him while he worked at

-21-

defendant.  Garcia has filed a separate lawsuit against defendant, claiming that his termination of employment was race and national origin discrimination.

Garcia also complained about the techniques that Bass and Procter of Corporate Security used during his interview.  He testified that Corporate Security used harassing tactics such as threats and insinuations.  For example, Corporate Security threatened to report him to his supervisors and told him that he was an officer of defendant and if he did not sign or cooperate, he would be fired.  Garcia complains that his statement was not complete.  He testified that there were many things or details that he discussed with Corporate Security that were not included, such as clarifications of different things and answers that he gave. For example, Garcia claims that Corporate Security left out the fact that he said he did not want to sign his statement, that Corporate Security threatened that he would be

disciplined if he did not sign it, and that he was coerced to sign the confidentiality acknowledgment.

Garcia does not know whether Corporate Security treated him any differently than it treats anybody else during an investigation.

### M.    Castanon's Relationship with Winters

Castanon admits that his professional and personal relationships with plaintiff, Garcia and Winters were different.  Castanon and Winters were close personal friends.  They went to college together at the University of Nevada Las Vegas where they were in the same fraternity.  Before joining defendant, they worked together for a year or two in Las Vegas.  However, Castanon testified that he did not consider his personal friendship with Winters as a potential problem in evaluating Winters' performance.  According to Castanon, this was a business setting and Winters had to achieve results just like everyone else.

Garcia testified that he recalled hearing that Castanon showed favoritism toward Winters. According to Garcia, Castanon and Winters were old friends who went on vacations together and traveled together. Castanon was Winters' direct supervisor. During their employment at defendant, Castanon hosted and paid for a birthday party for Winters. Castanon did not host birthday parties for any other direct reports.

### N.    Corporate Security's Investigation of Castanon and Winters

In October 2002, Winters and Castanon were investigated for alleged violations of defendant's PBC. Plaintiff believes that Winters did not obtain written approval for travel, accepted vendor gifts, and used vendor trips as paid vacations for his family. Specifically, plaintiff believed that Winters violated the PBC by attending the Sundance Film Festival and the Winter Olympics with his wife without obtaining written approval.

Plaintiff testified that defendant was negotiating with Convergys, a vendor, before and after Castanon and Winters took the Convergys-sponsored trips to the Sundance Film Festival and the Winter Olympics. Plaintiff thought that Castanon and Winters did not have a specific business purpose for their trip to the Sundance Film Festival and that they went as a customer of the vendor, which would have been inappropriate. Plaintiff further thought, but did not know for certain, that a vendor paid the expenses for Winters' wife to accompany him on these trips.

Plaintiff also testified that when Castanon and Winters returned from a trip to India to visit one of the vendors there, they came back with a number of items. Castanon brought plaintiff a coaster of some sort. Plaintiff believed that the coaster had been a gift from a vendor but admitted that she did not know for sure. Plaintiff also did not know who paid for the other things that Castanon brought back from India. Plaintiff

claims that Winters had a number of "trinkets and things" on his desk with vendors' names on them. However, she admits that she could not assess the value of any of them.

Plaintiff does not know whether Winters got written approval for any of his travel and further admits she cannot specifically say what vendor gifts Winters accepted in violation of defendant's PBC.  Plaintiff contends that defendant also has not produced any documentation that Winters received written approval for his travel.

Castanon testified that, at the time he decided to fire plaintiff and Garcia, he was aware that he was being investigated by Corporate Security.  According to Castanon, however, the outcome of that investigation was that there was substantial evidence that he asked and received proper approvals to attend the events that required approval and that the other items that were in question were clarified.  Castanon testified that he even provided documentation, an e-mail from Levine, to Corporate Security to substantiate the fact that he had the appropriate approval to attend the Sundance Film Festival and the Winter Olympics. Castanon admitted that his wife accompanied him on the trips to the Sundance Film Festival and the Winter Olympics, however, he personally paid for her plane tickets and expenses.

Castanon testified that the facts did not warrant firing Winters because, unlike plaintiff and Garcia, there was no clear violation of defendant's code of ethical conduct.  During his Corporate Security interview, Winters admitted that several personal items were improperly expensed to defendant, including a hotel receipt for a movie, two gift shop charges and travel to the airport and airport parking from the Sundance Film Festival, a meal expense from the Winter Olympics, and the rental car fee for a personal trip for Winters' wife to see her daughter's volleyball tournament.  Winters admitted that he did not review the expense reports completed by his assistant after the trips.

When asked whether he obtained approval for the Sundance Film Festival and Winter Olympics trips, Winters responded: "when Convergys [the vendor] invited us to the two events, I went to Tony [Castanon]. Tony told me that we needed to make sure Chuck Levine was OK with it before we said yes. Tony went to Chuck and I think he may have sent him an e-mail. I assume Chuck said yes, because we did attend." Plaintiff contends that, although Castanon obtained written approval for his own attendance, there is no evidence that he also obtained written approval for Winters' attendance at these events. Winters also admitted that while he was at the Winter Olympics he was not a host for defendant and didn't believe that Castanon was either. Winters testified that he and Castanon took the Convergys people to see defendant's new products but that it was nothing official.

Procter testified that, during Corporate Security's interview with Castanon, Castanon said that he obtained approval for all of Winters' vendor trips from Levine. Corporate Security determined that all of Winters' travel that was the subject of Corporate Security's investigation had been approved by Levine in accordance with defendant's policy. However, Bass and Procter do not recall seeing written approval for the trips when they conducted their investigation.

During the October 7, 2002 meeting, Castanon decided not to terminate Winters. However, Castanon did have some follow-up discussions with Winters about reviewing some processes with his administrative assistant regarding coding of vacation time, as well as following up to ensure that his expense reports were processed correctly, rather than assuming that his administrative assistant would process them correctly.

Kissinger testified that he thinks he reviewed Winters' signed statement before the October 7, 2002 meeting. Kissinger testified that he could not remember whether or not he made a formal recommendation

to Castanon regarding Winters.  However, Kissinger agreed with the recommendation that Winters be coached and counseled regarding management and recording of time and expenses instead of being fired.

Kissinger testified that he did not believe it was inappropriate for Castanon to participate in the decision making process with regard to plaintiff and Garcia while he was being questioned regarding his and Winters' travel and vendor relationships.  Kissinger explained that Castanon was plaintiff's supervisor, and he had not been proven to have done anything wrong at that point.  Kissinger testified he does not know whether or not he saw the complaint against Winters before the October 7, 2002 meeting, however, there was nothing in the complaint that would have caused him to question Castanon's decision about plaintiff and Garcia.

Castanon's employment was terminated in August 2003 as part of a reduction in force.  Kissinger testified that one of the reasons that Castanon's employment was terminated was because he did not deal with a personal conflict of interest with Winters.  Kissinger was aware of and supported Castanon's termination.

### O.    Direct Evidence of Discrimination

During the entire time they worked together, Castanon never said anything to plaintiff that she interpreted as derogatory about her gender.  Similarly, Garcia does not recall ever hearing Castanon make any comments about plaintiff that he viewed as sexist or off-color or that Garcia considered derogatory to women.  Although Garcia testified that "[e]veryone says off-color things," and that "[a]t conventions and things, I heard [Castanon] say things that could be misinterpreted," in fact, Garcia does not remember any specific comments that Castanon made "that could be misinterpreted."

While they worked at defendant, Garcia did not recall plaintiff telling him that she felt like Castanon treated her differently because she was a female. Garcia recalled that plaintiff and Castanon had general disagreements about how the business should proceed, but characterized those disagreements as normal discussions. While he worked at defendant, Garcia also never heard any women say anything about Castanon treating them in a way that they believed was sexist.

Other than her termination, in most cases plaintiff felt that she was generally treated well by Castanon. However, there were a few organizational decisions that Castanon made that were a little hard for her to figure out in terms of group responsibilities and organizational design. Plaintiff also claims that these were decisions that favored Winters over plaintiff.

### P.     Plaintiff's Beliefs about the Reason for Her Termination

Plaintiff believes there must have been some "ulterior motive" to terminate her employment. Plaintiff testified that the "ulterior motive" was that Castanon was covering for himself and Winters, both of whom had been investigated by Corporate Security. Plaintiff testified that she thought Castanon looked at her and Garcia's cases as an opportunity to take action to save not only his own job, but also Winters' job. Plaintiff claims that she was being "offered up as a sacrifice" by Castanon so that he and Winters would not have any adverse action taken against them. Plaintiff claims that no adverse action was taken against Castanon or Winters as a result of Corporate Security's investigations of them.

Plaintiff also contends that Castanon terminated her employment because of her gender, not because of the series of events in the e-mails. Plaintiff contends that she did not violate work rules of comparable seriousness to Garcia because there is no evidence that plaintiff received any vendor gifts, while it is undisputed that Garcia received a bottle of Grand Marnier. Plaintiff further contends that she did not make

any statements that could be construed as considering sharing bid information with a vendor like Garcia

wrote in his e-mail about the Diamond Cluster bid.  Moreover, plaintiff maintains that there is no evidence

that plaintiff and Garcia engaged in misconduct.

Plaintiff argues that the information that Corporate Security had and presented to Castanon and

Kissinger, combined with Castanon and Kissinger's knowledge of her character and ethics, demonstrated

an absence of evidence that she engaged in misconduct, making Castanon's decision to terminate her not in

good faith.  Specifically, plaintiff contends that she and Garcia denied engaging in misconduct in their

statements to Corporate Security, and explained that they were joking in the April and June 2002 e-mails.

Plaintiff believed that Winters' actions justified disciplinary action beyond counseling.  Plaintiff

testified that, compared to the action taken against her as a result of the investigation, the result of Winters'

investigation did not seem consistent.  Plaintiff contends that Castanon's decision to terminate her

employment but not terminate Winters' employment was gender discrimination.  Plaintiff testified that "the

only thing I have is that Tony [Castanon] and Alan [Winters] were best friends, and that Alan was a man,

and he was treated differently than I was, as was Tony."  Plaintiff further testified that Castanon treated

Garcia differently than Winters because Winters and Castanon were best friends.

Defendant claims that it is entitled to summary judgment on plaintiff's claims because plaintiff cannot

meet her prima facie case of gender discrimination, defendant has asserted a legitimate, nondiscriminatory

reason for her termination, and plaintiff has no evidence that defendant's stated reason for the termination is

pretext for discrimination.

### III.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670-71.  In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256; *see Adler*, 144 F.3d at 671 n.1 (concerning shifting burdens on summary judgment).  The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256.  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of

fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut," rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## IV.    Discussion

Plaintiff claims that her employment was terminated because of her gender in violation of both Title VII and the KAAD. The court notes that it may apply Title VII's standards to plaintiff's KAAD claim. *Best v. State Farm Mut. Auto. Ins. Co.*, 953 F.2d 1477, 1480 n.2 (10th Cir. 1991). Because Title VII's standards and burdens also apply to the KAAD, *see Aramburu v. Boeing Co.*, 112 F.3d 1398, 1403 n.3 (10th Cir. 1997), the court will not specifically address plaintiff's KAAD claim, and reaches the same conclusions under both statutes.

A plaintiff alleging unlawful gender discrimination in her employment must show, either directly or indirectly, that the employer's decision was motivated by intentional gender discrimination. *Chatfield v. Shilling Constr. Co.*, 2000 WL 1531846, at *2 (10th Cir. October 17, 2000) (citing *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000)). "Direct evidence is that which does not require an inference to prove discrimination, such as oral or written statements by an employer showing a discriminatory motive." *Id.* Because plaintiff concedes that she does not have any direct evidence of discrimination, the court applies the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). Under *McDonnell Douglas*, to survive summary judgment, plaintiff must raise a genuine issue of material fact on each element of her prima facie case of discrimination. *Randle*

*v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995).  The burden next shifts to defendant to articulate

legitimate, nondiscriminatory reasons for the challenged employment action.  If defendant makes such a

showing, the burden reverts to plaintiff to set forth facts that raise a genuine issue of material fact that

defendant's proffered reasons are pretextual and thus unworthy of belief.  *Id.*  If plaintiff can proffer such

evidence, the motion for summary judgment should be denied.  *Id.*

### A.    Prima Facie Case

To establish a prima facie case of wrongful termination because of her gender, plaintiff must show

that she: (1) belongs to a protected class; (2) was qualified for her position; (3) was discharged despite her

qualifications; and (4) that the position was not eliminated after plaintiff's discharge.  *Baca v. Sklar*, 398

F.3d 1210, 1216 (10th Cir. 2005); *Rivera v. City and County of Denver*, 365 F.3d 912, 920 (10th Cir.

2004); *Kendrick*, 220 F.3d at 1229.  However, the Tenth Circuit recently held that "the fourth element of a

prima facie case is a flexible one that can be satisfied differently in varying scenarios. . . . Indeed, where an

employer contends the actual reason for termination in a discriminatory firing case is not elimination of the

employee's position, but, rather, unsatisfactory conduct, the status of the employee's former position after

his or her termination is irrelevant."  *Plotke v. White*, – F.3d – , 2005 WL 984363, at *6 (10th Cir. 2005).

"The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse

employment action occurred 'under circumstances which give rise to an inference of unlawful

discrimination.'"  *Id*. (quoting *Kendrick*, 220 F.3d at 1227 (quoting *Texas Dep't of Cmty. Affairs v.

Burdine*, 450 U.S. 248, 253 (1981))).

It is undisputed that plaintiff meets the first three elements of the prima facie case.  The issue before

the court is whether plaintiff's position was eliminated after her discharge.  Plaintiff contends that her position

was not eliminated because other Vice Presidents assumed her job responsibilities.  Plaintiff does not argue,

and the record does not reflect, that any new person was hired to perform her job responsibilities.

Defendant contends that plaintiff's position was eliminated after her termination and that, when

plaintiff's employment was terminated, Shah assumed some of her existing responsibilities on the task force

and the rest of her responsibilities were assumed by the marketing department.  Defendant also points out

that the Tenth Circuit has determined that "the test for position elimination is not whether the responsibilities

were still performed, but rather whether the responsibilities still constituted a single, distinct position."  *Furr*

*v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir. 1996); *see also McMahen v. Gaffey, Inc.*, 52 Fed.

Appx. 90, 92 (10th Cir. 2002) (quoting *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992)

("'[s]preading the former duties of a terminated employee among the remaining employees does not

constitute replacement.'").

There is no dispute that plaintiff's job responsibilities, whether examined two weeks before her

termination or at the time of her termination, were dispersed among other employees and that no single

person performed her responsibilities in a distinct position after her termination.  However, because

defendant claims that the reason for plaintiff's termination was her alleged misconduct and not that her

position was eliminated, plaintiff need only demonstrate that "her termination occurred 'under circumstances

which give rise to an inference of discrimination.'"  *Plotke*, 2005 WL 984363 at *7 (quoting *Kendrick*, 220

F.3d at 1227).  Because plaintiff has asserted evidence that she was treated differently than Alan Winters, a

similarly situated male colleague, the court finds that plaintiff has met the light burden of proving her prima

facie case.  *See id.* at *5 ("The 'burden of establishing a prima facie case . . . by a preponderance of the

evidence' is 'not onerous.'" (quoting *McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 922 (10th Cir.

2001))).  Accordingly, the burden shifts to defendant to proffer a legitimate, nondiscriminatory reason for plaintiff's termination.

### B.        Legitimate, Nondiscriminatory Reason

Through Castanon and Kissinger, defendant has proffered a couple of reasons for terminating plaintiff's employment.  Castanon testified that he terminated plaintiff's employment because he believed she violated defendant's business and ethical policies regarding third parties and vendors.  The two primary reasons he fired plaintiff were: (1) she violated defendant's business and ethical policies associated with vendors; and (2) she failed to properly supervise Garcia with respect to those policies.  Castanon testified that it was clear from the documentation presented at the meeting that Garcia had violated defendant's policy on ethical business practices on a number of occasions and that plaintiff was, in many cases, copied on those same documents and chose not to take any action or address it.  Castanon also testified that he considered plaintiff's own violations, as well has her failure to properly supervise Garcia, to be "equally serious."  Although Castanon admits that he has no proof that defendant was harmed financially by plaintiff's alleged misconduct, and that he does not know whether or not plaintiff was ever successful in getting Garcia to obtain benefits from vendors for her, he testified that it was the "appearance of impropriety" that mattered to him.

Similarly, Kissinger testified that the reasons defendant fired plaintiff are summarized in the Talking Points and included: (1) not properly reporting or receiving advance approval for vendor paid entertainment for plaintiff or Garcia; (2) participating or allowing an unreasonable level of vendor-paid entertainment (or defendant-paid); (3) soliciting or encouraging vendor entertainment; and
(4) creating potential or apparent conflicts of interest and inappropriate relationships with third-parties.

Defendant has satisfied its "exceedingly light" burden to provide nondiscriminatory reasons to terminate plaintiff's employment. *See Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1279 (10th Cir. 1999). Accordingly, the court turns to the issue of pretext.

**C.     Pretext**

Plaintiff contends that defendant's proffered reasons for her termination are pretext for discrimination. To establish pretext, a plaintiff must show either that "a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Watts v. City of Norman*, 270 F.3d 1288, 1293 (10th Cir. 2001). Plaintiff may accomplish this by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951-52 (3d Cir. 1996)). Plaintiff may also establish pretext by showing that the employer "treated the plaintiff 'differently from other similarly-situated employees who violated work rules of comparable seriousness.'" *Watts*, 270 F.3d at 1293 (quoting *Kendrick*, 220 F.3d at 1230). However, plaintiff's "mere conjecture that [her] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988).

Plaintiff's evidence of pretext essentially revolves around two main arguments: (1) Castanon's reasons for the termination were false, and (2) plaintiff was treated differently than Winters.

1.      **False Reason for Termination**

Plaintiff (1) claims that Castanon should not have made the decision to terminate plaintiff's employment because he was being investigated at the same time; (2) disputes that Castanon could have had a good faith belief that plaintiff engaged in misconduct that warranted her termination, especially after she and Garcia both explicitly denied any wrongdoing; and (3) claims that Castanon was negligent in relying on Corporate Security's investigation to terminate her without talking directly to her or considering her previous work record.

Regarding plaintiff's argument that Castanon should not have made the decision to terminate plaintiff's employment because he was the subject of a similar investigation at that time, the court will not substitute its business judgment for that of the employer. *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999); *Branson*, 853 F.2d at 772. "The relevant inquiry is not whether defendant's reasons for its . . . decisions were 'wise, fair or correct,' but whether defendant . . . 'honestly believed those reasons and acted in good faith upon those beliefs.'" *Kaster v. Safeco Ins. Co. of Am.*, 212 F. Supp. 2d 1264, 1274 (D. Kan. 2002) (quoting *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999)).

With regard to plaintiff's arguments that Castanon did not have a good faith belief that plaintiff engaged in misconduct warranting termination and that Castanon negligently relied on the results of Corporate Security's investigation,[3] defendant contends that plaintiff has not shown that Castanon's stated

---

[3]Plaintiff contends that Corporate Security conducted a biased investigation and testified that she felt Bass and Procter were out to get her. However, plaintiff also testified that she felt that Bass and Procter's tactics with her were reflective of their tactics with all employees that they investigated. There is no evidence that Corporate Security treated plaintiff any differently than other employees during the

(continued...)

reasons for terminating her employment were unworthy of belief.  Defendant contends that Castanon relied

in good faith on the results of Corporate Security's investigation to make the termination decision, and that

Castanon's belief at the time he made the decision is the relevant inquiry - not whether the allegations against

plaintiff were later proven to be false.

The court examines the facts as they appeared to the person making the termination decision.

*Watts,* 270 F.3d at 1294.  It is undisputed that Castanon made the termination decision based solely on the

information he received during the meeting with Corporate Security (which included plaintiff's and Garcia's

statements to Corporate Security) and his review of defendant's policies.  Castanon had the opportunity to

review plaintiff's and Garcia's written statements to Corporate Security, in which they both denied violating

defendant's policies.  Castanon has testified that, even though he had no evidence that defendant was

harmed by plaintiff's conduct, it was the appearance of impropriety that mattered to him.  As the court has

previously noted, it will not substitute its business judgment for that of the employer.  *Simms*, 165 F.3d at

1330; *Branson*, 853 F.2d at 772.  Moreover, the court recognizes that it must evaluate employers'

decisions based upon the information available to them at the time the decision was made.  *Watts*, 270 F.3d

at 1295.  Plaintiff has presented no evidence that, at the time Castanon made the decision to terminate her

employment, he did not have a good faith belief (1) that, despite her flat denial, she had violated defendant's

business and ethics policies regarding vendors or (2) that, at the very least, her actions created the

appearance of impropriety.

---

[3](...continued)
investigation.

-36-

Even if plaintiff showed that Castanon acted hastily in accepting the results of Corporate Security's investigation without talking to her or considering other facts, including her prior work history, Castanon's action are, at most, negligent.  Negligence or poor judgment do not establish intent to discriminate, even when plaintiff later submits evidence that the allegations that led to her termination of employment may have been false.  *Vega v. Sprint Corp. (PCS)*, 2004 WL 2414100, at *13 (D. Kan. Oct. 25, 2004) (citing *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998)).  Accordingly, the court finds that Castanon's stated reason for the employment decision was not pretext for discrimination.

### 2.      Treatment of Similarly Situated Employees

Plaintiff claims that defendant treated plaintiff differently than Winters, who plaintiff claims is a similarly situated male employee who violated work rules of comparable seriousness.  Plaintiff claims that a genuine issue of material fact exists regarding whether Castanon treated plaintiff and Winters differently because of his friendship with Winters or because of their gender.

Defendant contends that plaintiff was treated the same as Garcia, and that Winters is not similarly situated because his alleged misconduct was not as egregious as plaintiff's and Garcia's.  Defendant also contends that plaintiff herself has acknowledged that Castanon had ulterior and nondiscriminatory motives for terminating her employment – his friendship with Winters and preserving his own job.

"An employee is similarly situated if the employee deals with the same supervisor and is subject to the 'same standards governing performance evaluation and discipline.'"  *Vega*, 2004 WL 2414100, at *13 (quoting *Aramburu*, 112 F.3d at 1404).  As the court has previously noted, similarly situated employees are ones who have violated work rules of comparable seriousness.  *Watts*, 270 F.3d at 1293.  Arguably, both Winters and Garcia were similarly situated to plaintiff.  Plaintiff was a Vice President who reported to

-37-

Castanon, and Garcia reported to plaintiff.  Plaintiff and Garcia were investigated for alleged violations of defendant's policies regarding vendor relationships and were alleged to have engaged in nearly the same misconduct.  Both plaintiff and Garcia's employment were terminated, on the same day, by Castanon. Castanon was not Garcia's direct supervisor, but was his second level supervisor and made the determination to terminate his employment.  Winters was a Vice President, reported directly to Castanon, and was alleged to have violated defendant's policies regarding relationships with vendors.  Winters was counseled regarding his coding of certain expenses with regard to vendor-sponsored travel and directed to work with his assistant to ensure that expenses and vacation time were properly recorded.[4]  Plaintiff, Garcia and Winters were all subject to the same policies and ethics in dealing with vendors.  Viewing the entire record in a light most favorable to plaintiff, and even considering defendant's arguments that Winters' alleged misconduct was not nearly as egregious as plaintiff's, the court will consider Winters and plaintiff to be similarly situated.

That being said, the court's analysis does not stop there.  Plaintiff contends that she has established pretext by showing that she was treated differently than Winters.  However, differences in treatment that can be explained by a nondiscriminatory motive will not sustain a pretext claim.  *Kendrick*, 220 F.3d at 1320. The record reflects that, at the time Castanon decided to terminate plaintiff's employment, Castanon was also being investigated for alleged violations of defendant's policies governing relationships with vendors.  In fact, Castanon's travel and expenses on two trips that he took with Winters were investigated at the same time as Winters was being investigated.  Plaintiff testified that Castanon had an "ulterior motive" to discipline

---

[4]Plaintiff also has alleged that Winters may have violated defendant's policies regarding accepting gifts from vendors without any record support other than her own speculation.

her more harshly so that he could cover for himself and Winters, both of whom had been investigated. Plaintiff also testified that she thought Castanon looked at her and Garcia's cases as an opportunity to take action to save not only his own job, but also Winters' job, and that plaintiff was being "offered up as a sacrifice" by Castanon so that he and Winters would not have any adverse action taken against them.

The record also reflects that Winters and Castanon had been close personal friends for years. The went to college together, were fraternity brothers, and worked together before their employment with defendant. Castanon and Winters traveled together and went on vacations together. Garcia testified that he recalled hearing that Castanon showed favoritism toward Winters. Plaintiff testified that Castanon treated Garcia differently than Winters because Winters and Castanon were best friends. Although Castanon testified that he did not consider his personal friendship with Winters as a potential problem in evaluating Winters' performance, the record reflects that Castanon treated Winters differently than plaintiff or any other direct report, both male and female. For instance, Castanon hosted and paid for a birthday party for Winters even though he did not do so for any other direct report.

Viewing the entire record, the only support that plaintiff has for her discrimination claim is that Winters was a man and he was not terminated. Plaintiff herself testified that, "the only thing I have is that Tony [Castanon] and Alan [Winters] were best friends, and that Alan was a man, and he was treated differently than I was, as was Tony." Even viewing the evidence as a whole in a light most favorable to plaintiff, it is insufficient to establish pretext where Castanon's different treatment of Winters clearly stems from their close friendship. Winters benefitted from Castanon's favoritism toward him. While such differential treatment may have been unfair to plaintiff (and Castanon's other direct reports, both male and female), it does not raise an inference of discrimination. "[A]n employer's actions based on loyalty to a

friend or relative . . . are not considered 'discriminatory,' even where they benefit the nonprotected friend or relative at the expense of a more qualified, protected person." *Neal v. Roche*, 349 F.3d 1246, 1251 (10th Cir. 2003).  Moreover, "employers are free to employ nondiscriminatory criteria that are 'unfair' or even reprehensible, so long as they are not discriminatory." *Id*. at 1252.

For the foregoing reasons, plaintiff has presented no evidence to create a genuine issue of material fact that defendant's proffered reasons for terminating her are pretext for discrimination.  Summary judgment is thus appropriate on plaintiff's claims of gender discrimination based upon her discharge.

**IT IS THEREFORE ORDERED** that defendant's Motion for Leave to File Supplemental Exhibit (Doc. 134) is granted.

**IT IS FURTHER ORDERED** that defendant's Motion for Summary Judgment (Doc. 120) is granted.  This case is hereby dismissed.

Dated this <u>13th</u> day of May 2005, at Kansas City, Kansas.

<u>**s/ Carlos Murguia**</u>
**CARLOS MURGUIA**
**United States District Judge**